**LOUISVILLE GAS & ELECTRIC CO.**
**v. SANDERS.**

Court of Appeals of Kentucky.
March 28, 1952.

As Modified on Denial of Rehearing
June 13, 1952.

Woodward, Hobson & Fulton and Fielden Woodward, Louisville, for appellant.

Mahan, Davis & Mahan, Louisville, for appellee.

STEWART, Justice.

On October 7, 1949, plaintiff, L. M. Sanders, filed suit against Louisville Gas & Electric Company to recover $3,143, alleging that defendant negligently permitted gas to escape from its gas line and damage plaintiff's trees, shrubs and grass. The defense was a denial and a plea that if plaintiff's property was injured by gas it was not the gas of defendant. A verdict for plaintiff for $2,500 was returned by the jury. Defendant appeals from a judgment entered thereon.

The grounds urged for reversal are: (1) Defendant was entitled to a peremptory instruction both at the conclusion of plaintiff's and at the conclusion of all the testimony; (2) the court erred in refusing to sustain defendant's written exceptions and objections to the deposition of Dr. Peter K. Knoefel; (3) the court wrongfully refused to admit defendant's offered "Exhibit E" and to permit its expert witness to testify concerning this exhibit; (4) the court erred in declining to give to the jury the instructions tendered by defendant and also in giving to the jury instructions that were prejudicial to it; and (5) the verdict is not supported by the evidence. We shall consider the above contentions in their order.

It appears from the record that for approximately twenty-five years prior to 1947, appellee had lived on the property involved in this litigation, which is located west of Louisville on U. S. Highway 31–W at Valley Station, and during this time there had been no damage by gas to his trees, shrubs or grass. Appellee and F. T. Etscorn, a neighbor whose residence lot adjoins appellee's, testified that previous to 1946 the trees and shrubbery in appellee's yard were fully leaved out and the lawn had a "nice stand of grass"; that during 1947 the trees, shrubs and grass started to die in both Etscorn's and appellee's yards; and that, although trees and shrubs were replanted and grass seed was sown in 1948 in appellee's yard, all this plant life died.

In December, 1948, after appellant was notified by appellee that its escaping gas could be the cause of the trouble, it inspected its line and conducted tests on appellee's property. Numerous borings were sunk in the yard by appellant's employees at this time and a quantity of combustible gas was found to be present in all of the barholes. Appellant claimed, however, that this gas revealed no carbon monoxide when tested in the laboratory and that, since all gas distributed by appellant is manufactured gas and contains from four to ten per cent carbon monoxide, the gas discovered on appellee's property could not have been that of appellant. But appellee produced an expert witness who testified that water in the soil will absorb carbon monoxide, as this compound is "fairly soluble". It was admitted that appellant's gas would kill trees, shrubs and grass, and that evidence of dying vegetation in the vicinity of gas lines is a reliable indication of escaping gas. Previously, on August 4, 1948, a leak had been found and stopped in a line running to the Etscorn property, a few feet from appellee's yard boundary. In the latter part of December, 1948, appellant found a leak in its service line leading from its main to the regulator in appellee's yard. The break was in the portion of the line that was out in the highway, near the edge of the pavement, and this line was promptly replaced. The following summer, according to appellee, there was a "good stand" of grass and he has "had no trouble during the year 1949, or to date."

Appellant introduced proof that many natural gas wells, which are now practically all abandoned, had been drilled from about 1860 to the present time between Louisville and the western edge of Jefferson County; that not less than ten wells are now supplying gas to individual consumers living between the Sanders property and the city limits; that when a gas well is abandoned it may become stopped-up by the casing rotting and by sand and gravel filling it; that when this occurs the gas, if any be present, will often escape through the sand and gravel and, in rising toward the sur-

face, follow the line of least resistance; and that under certain conditions free gas will often travel laterally and has been known to come to the surface in large quantities as far as 500 feet from the original orifice. Significantly, it was brought out through appellant's witnesses that no gas well, active or abandoned, was known to be located nearer to appellee's property than 3,000 feet.

Two theories of appellant that its gas did not cause appellee's damage merit some discussion. One of these is that the gas leak that was discovered, so appellant contends, was in its service line out on the highway. This line connects with an 8-inch main, 30 inches down, on the opposite side of the highway from appellee's property, and it rises as it comes toward the regulator located in appellee's yard. At the road ditch this line is only from eight to ten inches deep. As gas is lighter than air, appellant maintains that the gas would rise to the surface immediately above the leak and dissipate into the air. At most, it asserts that the gas would travel no farther than the ditch line and then escape from the ground because the pipe is at such a shallow depth. This conjecture is in direct opposition to appellant's opinion evidence as to how gas emits from a stopped-up gas well. Its experts emphasized the long distance gas would sometimes travel underground in such a case. It would depend upon the permeability of the subterranean soil, these experts stated, as to how far gas would at times migrate laterally before escaping from the ground.

Another theory advanced by appellant is that the leak was so small that only a slight quantity of gas would discharge into the earth and, since the leak in addition was so far distant from appellee's yard, it would be impossible for a sufficient amount of gas to reach appellee's yard and thus damage his vegetation. This argument overlooks the fact that the gas column in the leaky pipe was under a pressure that would force a steady stream of gas through the break. Appellant's witnesses also stated that as much as 90 cubic feet of gas an hour might leak out at the break. This would be about 65,000 cubic feet of gas a month, or the amount required to heat a good-sized house during the winter months.

We have concluded that the evidence produced by appellee, and indeed by appellant's own witnesses, was sufficient to take the case to the jury. In Kentucky-West Virginia Gas Co. v. Slone, Ky., 238 S.W.2d 476, 480, this statement was made and it seems to apply here: "Negligence may be inferred from circumstances properly adduced in evidence, provided those circumstances raise a fair presumption of negligence; and circumstantial evidence alone may authorize the finding of negligence."

Appellant admitted that gas was present in appellee's yard and that there were leaks in its service line running from its main to appellee's regulator and also into the adjacent Etscorn yard. This, coupled with the evidence of appellee that he had had no trouble with his vegetation for twenty-five years previous to 1946 and that after the service line leaks were repaired by appellant his trees, shrubs and grass thrived, was sufficient for the jury to conclude, without resorting to pure speculation, that appellant's negligence was the proximate cause of the damage. Opinion or expert evidence, relied upon so heavily by appellant as a defense, is neither conclusive nor controlling as against evidence of facts. Consolidation Coal Co. v. Marcum's Adm'r, 289 Ky. 220, 158 S.W.2d 150.

The second ground urged for reversal is that the lower court wrongfully admitted a considerable portion of the deposition of Dr. Peter K. Knoefel. This witness was well qualified by educational standards as a pharmacologist and was introduced as such. Chiefly on cross-examination he discredited himself somewhat as one having any experience in the practical problems involved in this litigation and even made statements harmful to appellee's cause and which supported certain contentions of appellant. However, having carefully read the testimony of Dr. Knoefel, we do not believe that the court below erred in allowing the jury to consider his deposition as a whole.

■ The third error complained of was the refusal of the court to allow appellant to introduce and use a diagram known as "Exhibit E" and to permit L. P. Aker, one of its chemical engineers, to answer the question set forth hereinafter. The exhibit purported to show how gas from an abandoned, stopped-up well would migrate through the soil to the surface. Counsel for appellant, making reference to the drawing, interrogated the witness thus: "Now, Mr. Aker, assuming for the moment that a gas well such as you have described is in existence and is allowing gas to seep laterally to the surface, what, if anything, would cause that conditon to change or to stop?" The following objection to the question was interposed: "The plaintiff objects because there is no proof at all that there is a gas well, an uncapped gas well such as he had described anywhere within a quarter of a mile of my client's property, and he says the greatest distance he ever knew was * * *." The court sustained the objection and appellant excepted.

The offered diagram and evidence were incompetent because we believe it is fundamental that a litigant has no right to introduce an exhibit and testify therefrom in order to show an assumed condition which admissible proof has not established to exist in fact. It might be added that appellant's witnesses, as we view the record, had already testified in detail about every point depicted in the tendered exhibit and attempted to be introduced by Aker, so that, after all, appellant was able to get this theory of the case adequately before the jury.

■■ Appellant complains that the trial court submitted to the jury only the question of whether or not its gas escaped and damaged the vegetation in appellee's yard, whereas appellant contends the proper instructions, offered by it, would have required the jury to find that it was negligent in the installation, maintenance and inspection of its line. Instructions I and II were in substance that there was a leak in appellant's line, and if appellant could have known by the exercise of ordinary care of the existence of that leak, and gas escaped therefrom which operated proximately to bring about appellee's loss, the jury should find for appellee, in the absence of an intervening agency that would negative the idea that appellant's gas caused appellee's damage.

The doctrine of *res ipsa loquitur* applies here if the damage suffered by appellee's trees, shrubs and grass can be traced to gas escaping from an instrumentality controlled exclusively by appellant. See 38 C.J.S., Gas, § 47(c) (b), page 746. The instructions under attack not only followed this doctrine but required, in additon, that appellant would only be liable under the circumstances if it could have known by the exercise of ordinary care of the existence of the leak. We think Instructions I and II not only covered the law of this case but, on the other hand, were extremely favorable to appellant.

■ The last contention is predicated upon the assumption that the damages were inadequately proven. A qualified tree expert testified as to the criterion for determining the value of trees according to their size; Etscorn described in detail the injury to the plant life and estimated the size of the various trees that had died; appellant gave proof as to what it had cost him to replace the trees, shrubs and grass destroyed; and, finally, the jury went to the yard and made a personal inspection. We find no merit in the claim that the verdict is not supported by the evidence.

Wherefore, the judgment is affirmed.